

# Missouri Court of Appeals

## Southern District

In Division

IN THE INTEREST OF P.T.M.,  )
BARRY COUNTY JUVENILE OFFICE,  )
                                )
    Respondent,  )    No. SD37606
                                  )
v.  )    **Filed:  March 31, 2023**
                                  )
P.T.M.,  )
                                  )
    Appellant.  )

APPEAL FROM THE CIRCUIT COURT OF BARRY COUNTY

Honorable Johnnie E. Cox, Judge

**AFFIRMED**

Appellant, P.T.M., appeals the order of the juvenile division of the circuit court ("the juvenile court") dismissing the juvenile cause of action against him and certifying him to be prosecuted as an adult under the general laws for the offense of statutory rape in the first degree.[1] *See* § 211.071.[2]  In a single point, P.T.M. argues the juvenile court abused its discretion in dismissing the juvenile cause of action and certifying P.T.M. to be prosecuted as an adult under the general laws, "because the certification hearing was held absent the required full

---

[1] While the order is not denominated a judgment, an order dismissing a juvenile cause of action and certifying a minor to be prosecuted as an adult under the general laws is final and appealable. ***Interest of D.E.D.***, 653 S.W.3d 427, 430-31 (Mo. App. W.D. 2022).

[2] All statutory citations are to the 2016 edition of the Revised Statutes of Missouri, updated through the 2021 Cumulative Supplement.  All rule references are to Missouri Court Rules (2022).

investigation" as required by "Missouri statutes, court rules, and juvenile officer performance standards[.]"[3]  Finding no such abuse of discretion, we affirm the juvenile court's order.

## Factual and Procedural Background

On April 26, 2022, Jerrod Jarvis, the deputy juvenile officer of Barry County ("DJO Jarvis"), filed a petition in the juvenile court alleging that P.T.M. committed the felony of statutory rape in the first degree by knowingly having intercourse with a child less than 14 years old.  P.T.M. was 17 years old when the petition was filed.[4]  Exhibit 1 to the petition alleged:

> The victim stated that [she] and [P.T.M.] were playing a game and were hiding together in the chicken coop.  She advised that [P.T.M.] kept asking her to have sex with him.  She stated that she repeatedly told him no.  She advised that [P.T.M.] pulled down his pants and forced himself on her.  The victim advised that she continued to tell [P.T.M.] to stop but that he was bigger than her.

That same day, DJO Jarvis filed a motion for certification to allow prosecution under the general laws and a "211.071 RSMo. Report by Juvenile Officer."  DJO Jarvis's report alleged:

1.  The juvenile is alleged to have committed the felony of Statutory Rape in the First Degree.

2.  This offense was considered to be of a vicious or forceful nature.

3.  The juvenile is alleged to have committed the offense against a person.

4.  The juvenile has had one prior referral to the Juvenile Office.  This prior referral was for Domestic Assault.  The juvenile has been on Formal Probation since December 15, 2021.

5.  The juvenile currently has contact with delinquency/probation officers in the 39th Circuit Juvenile Office.  The juvenile has further been placed in the custody of the State of Missouri.

6.  The juvenile was currently living in Exeter, MO. with his current Children's Division approved placement.  The juvenile has struggled to remain in any healthy home that provides structure.  The juvenile seems to struggle with anger and it was recommended that he be enrolled in counseling.

7.  The juvenile is currently 17 years old.

---

[3] Respondent filed no respondent's brief in this appeal.  "While there is no penalty for that omission, we must adjudicate [P.T.M's] claim of error without the benefit of whatever argument, if any, Respondent could have made in response to it." *Scates v. State, Dept. of Soc. Servs., Div. of Child Support Enf't*, 978 S.W.2d 793, 793 n.1 (Mo. App. S.D. 1998).

[4] P.T.M. was born in September 2004.  The alleged offense occurred on February 21, 2022.

8.    The range of programs and facilities available to the juvenile court begin with low level, informal probation with a juvenile officer.  The next level is formal probation.  The [c]ourt may intensify supervision of a juvenile by ordering intense supervision.  Even with the highest level of probation, keeping the juvenile in the public only guarantees contact with the juvenile three times per week.  The community-based probation situations rely on community resources for programs for rehabilitation.  The juvenile office knows of no rehabilitation program in the community that would provide services adequate to enable the above juvenile to return to the community in such a way that potential victims would be protected.

The next level of supervision would be a commitment to the Division of Youth Services, however, due to the above juvenile's age being so close to 18 years of age, this is not a viable option as enough time is not available for rehabilitation and treatment.

9.    As stated herein, due to the juvenile's age and the severity of the offense alleged the juvenile system is not an option for treatment or supervision for the above juvenile.

10.  There is no racial disparity in certification in the 39th Circuit.

On May 31, 2022, the juvenile court held a certification hearing.  DJO Jarvis testified at the hearing.  According to DJO Jarvis, he has been a juvenile officer since 2018, and became acquainted with P.T.M. "whenever [he] brought [P.T.M.] in on a domestic assault charge." P.T.M. was put into state care with Missouri's Children's Division because he had assaulted his girlfriend and his grandmother.  His grandmother was not willing to have him remain in her home.

DJO Jarvis testified he prepared a report pursuant to 211.071.  DJO Jarvis was asked about the contents of the report.  DJO Jarvis considered P.T.M.'s alleged offense for statutory rape to be a "forceful" offense committed against a person and noted it occurred while P.T.M. was on probation for the domestic assault case.  Prior to the alleged statutory rape, DJO Jarvis had "two or three meetings" with P.T.M.  During those meetings, DJO Jarvis did not have any problems with P.T.M.'s attitude and described him as "always upbeat, [and] kind[.]"  Based on these meetings with P.T.M., DJO Jarvis believed P.T.M. understood right from wrong since P.T.M. admitted he had made mistakes and "was moving forward with his life[.]"

Sometime after the alleged statutory rape took place, however, P.T.M. was placed in care outside of DJO Jarvis's area, so DJO Jarvis was unable to meet with him after the date of the

alleged offense. DJO Jarvis described P.T.M.'s current attitude as "unknown" in the social history report. After P.T.M. was placed in detention in Wright County, DJO Jarvis called to "follow[] up with how things are going[.]" In addition, DJO Jarvis called the various detention facilities where P.T.M. was placed to ask how P.T.M. was doing.

Once P.T.M. was placed in alternative care with Missouri's Children's Division, DJO Jarvis had access to the report contained in P.T.M.'s alternative care case. He reviewed that report and did not see a mental health diagnosis contained in it. DJO Jarvis acknowledged P.T.M. had been placed in more than one program as a result of his mental health issues, but DJO Jarvis was not aware of an actual mental health diagnosis by a mental health professional. DJO Jarvis also testified that P.T.M. admitted he had used marijuana in the past and had completed a drug rehabilitation program.

When asked about P.T.M.'s school history, DJO Jarvis testified P.T.M. "had attended both Reeds Spring School for a short period of time and had been at Exeter for approximately two to three weeks whenever this incident had occurred" but the time period was not long enough for P.T.M. to have incurred any sort of disciplinary actions. DJO Jarvis did not have P.T.M.'s school records and did not know how P.T.M. was doing academically.

DJO Jarvis testified that both of P.T.M.'s parents were deceased. He did not look into parental drug use or talk to P.T.M. about any previous child abuse or neglect. DJO Jarvis testified he had been contacted by another juvenile officer who told him there had been concerns from P.T.M.'s foster parents "about some behaviors that [P.T.M.] was having, lingering in portions of the house where the girls were[.]"

DJO Jarvis, who had previously been a youth specialist with the Division of Youth Services ("DYS") for six years, was not aware of any other less restrictive environment besides DYS and did not believe any of the less restrictive rehabilitative programs in the juvenile system would be appropriate. While employed by DYS, he "specifically worked with kids who were sexual offenders, and most of them were in [DYS] between nine months and two years[.]" DJO

4

Jarvis "didn't believe [DYS] would be a viable option that could give [P.T.M.] the services that were needed to help him work through the issues that he needed to work through." While it was "conceivable" that P.T.M. could possibly complete a program at DYS, DJO Jarvis did not believe "it is likely to occur that he would be able to rehabilitate himself in that amount of time with his age and the – his past history of violence towards females, whether they be young or old. I think there's more there than he just made a poor choice."

During closing argument, P.T.M.'s counsel argued there had been "insufficient information regarding his mental health history, regarding his – his personal history. I mean, at most, the probation officer said he maybe had three months, and he didn't even do his due diligence, which is required in the juvenile officer performance standards in completing his social history summary."

The juvenile court dismissed P.T.M.'s juvenile action and certified him to be tried as an adult under the general laws. The juvenile court found P.T.M. was not a proper subject to be dealt with under the juvenile code because:

(a) the offense alleged, Statutory Rape First Degree, in violation of section 566.032, RSMo. is serious;

(b) the offense alleged is an offense against persons;

(c) the record and history of the juvenile reflects the juvenile has had the following contacts with the juvenile justice system, [P.T.M.] was under the jurisdiction of the court in reference to case 21BR-JU00158 for domestic assault, and the record and history of the juvenile reflects the juvenile has previously received the following rehabilitative services, Formal Probation, and the juvenile failed to derive benefit from said services;

(d) no placement, program or facility available to the court for the juvenile's treatment under the juvenile code would provide sufficient protection to the community;

(h) protection of the community requires transfer to the court of general jurisdiction;

(i) there was no evidence that the juvenile would benefit from treatment in a juvenile facility. Given the seriousness of the offense, the age of the juvenile and the limited time for rehabilitating someone who is charged with this particular offense, and the fact that no evidence was adduced to demonstrate the availability of a facility which could guarantee the

5

juvenile's confinement, it is apparent that there are no reasonable prospects for rehabilitation[.]

P.T.M. appeals from that order. In a single point, P.T.M. argues the juvenile court abused its discretion in dismissing the juvenile cause of action and certifying P.T.M. to be prosecuted as an adult under the general laws, "because the certification hearing was held absent the required full investigation" as required by "Missouri statutes, court rules, and juvenile officer performance standards[.]"

## Standard of Review

Our review of a juvenile court's decision to terminate jurisdiction over a juvenile offender is limited to a determination of whether in the totality of the circumstances the juvenile court abused its discretion. *State v. Woodworth*, 941 S.W.2d 679, 697 (Mo. App. W.D. 1997) (quoting *In re Interest of A.D.R.*, 603 S.W.2d 575, 580-81 (Mo. banc 1980)). An abuse of discretion exists where the juvenile court's ruling is so unreasonable and arbitrary that it shocks the sense of justice and is clearly against the logic of the surrounding circumstances. *Interest of T.D.S.*, 643 S.W.3d 510, 516 (Mo. App. E.D. 2021). We defer to the juvenile court on issues of credibility. *Woodworth*, 941 S.W.2d at 692.

## Analysis

Section 211.071 sets out the process for certification of a juvenile for trial as an adult.

> When a certification hearing is required by section 211.071.1, "[a] written report shall be prepared . . . developing fully all available information relevant to the criteria which shall be considered by the court in determining whether the child is a proper subject to be dealt with under the provisions of [chapter 211] and whether there are reasonable prospects of rehabilitation within the juvenile justice system."

*J.N.W. v. Juvenile Officer*, 643 S.W.3d 618, 631 (Mo. App. W.D. 2022) (quoting § 211.071.6)). "[T]he court must consider the juvenile officer's report which must contain *all available information* relevant to the court's consideration in making a certification determination." *T.D.S.*, 643 S.W.3d at 519. Section 211.071.6 provides a non-exhaustive list of ten factors to be included in the report. *J.N.W.*, at 631-32. These factors include:

6

(1) The seriousness of the offense alleged and whether the protection of the community requires transfer to the court of general jurisdiction;

(2) Whether the offense alleged involved viciousness, force and violence;

(3) Whether the offense alleged was against persons or property with greater weight being given to the offense against persons, especially if personal injury resulted;

(4) Whether the offense alleged is a part of a repetitive pattern of offenses which indicates that the child may be beyond rehabilitation under the juvenile code;

(5) The record and history of the child, including experience with the juvenile justice system, other courts, supervision, commitments to juvenile institutions and other placements;

(6) The sophistication and maturity of the child as determined by consideration of his or her home and environmental situation, emotional condition and pattern of living;

(7) The age of the child;

(8) The program and facilities available to the juvenile court in considering disposition;

(9) Whether or not the child can benefit from the treatment or rehabilitative programs available to the juvenile court; and

(10) Racial disparity in certification.

§ 211.071.6.  "The report should therefore be comprehensive and the juvenile court should consider the report in its entirety.  The juvenile officer's testimony, in addition to the report itself, is relevant evidence for the juvenile court's consideration."  *T.D.S.*, 643 S.W.3d at 519.

"The requirements of § 211.071 are reiterated in Rules 129.03 and 129.04."  ***Interest of E.T.S.,*** WD 85088, 2023 WL 139280, at *4 (Mo. App. W.D. 2023).  Rule 129.03 requires the juvenile officer to "make an investigation to aid the court in determining whether the juvenile is a proper subject to be dealt with under the juvenile code" and then to provide "[a] written report of the investigation" prior to the dismissal hearing.[5]  Rule 129.03(a)-(b).  The court may order a

---

[5] The comment to Section 5.4 of Appendix B. Missouri Juvenile Officer Performance Standards 2017, states, in relevant part:

> For the purpose of the juvenile officer's investigation and report, the juvenile officer shall fully gather, develop, and provide all available information relevant to the criteria

7

supplemental investigation by the juvenile officer and a written report thereof and may continue or adjourn the hearing to allow the juvenile officer to supplement the investigation and written report. Rule 129.03(c).

Rule 129.04 governs the "Dismissal Hearing":

> At the hearing, which shall be held on the record, the court shall receive evidence on whether the juvenile is a proper subject to be dealt with under the juvenile code. The juvenile officer who prepared the report of the investigation required under Rule 129.03 may be examined by counsel. All parties shall be afforded the opportunity to testify, present evidence, cross-examine witnesses, and present arguments of law and fact and arguments concerning the weight, credibility and effect of the evidence.

Rule 129.04(b).

The juvenile court, at the evidentiary hearing on the record, had before it the section 211.071 report filed by DJO Jarvis. DJO Jarvis's report, while brief, described the findings of his investigation for each of the factors required by section 211.071.6. During the hearing, DJO Jarvis testified about his investigation, which included his interactions with P.T.M., his discussion with another juvenile officer familiar with P.T.M., the report from P.T.M.'s alternative care case, and his conversations with staff about how P.T.M. was doing at detention facilities where P.T.M. was staying. While the juvenile court certainly could have ordered DJO Jarvis to supplement his investigation and report pursuant to Rule 129.03(c), it was not required to do so. Nor did P.T.M.'s counsel ever request that the court order a supplemental investigation or report. P.T.M. has not demonstrated his hearing was held in the absence of the required full investigation of available evidence. The juvenile court did not abuse its discretion in dismissing P.T.M.'s juvenile cause of action and certifying him to be prosecuted as an adult under the general laws.[6] P.T.M.'s point is denied.

---

considered by the court in determining whether to grant the motion to dismiss for prosecution under the general law. The criteria to be covered by the investigation should be consistent with that required by statute.

[6] P.T.M. does not challenge how the juvenile court weighed the factors. In assessing the factors in section 211.071, the juvenile court is entitled to significant discretion in reaching its certification determination. **T.D.S.**, 643 S.W.3d at 519. It is not required to give equal weight to, nor to make express findings on, each

## Conclusion

The juvenile court's judgment is affirmed.

MARY W. SHEFFIELD, J. – OPINION AUTHOR

DON E. BURRELL, J. – CONCURS

BECKY J. W. BORTHWICK, J. – CONCURS

---

one of the non-exclusive statutory factors. ***J.N.W.***, 643 S.W.3d at 632. It "is only required by section 211.071.7(4) to make '[f]indings showing the reasons underlying the court's decision to transfer jurisdiction' in a manner 'that is sufficient to permit meaningful appellate review.'" ***Id.*** (quoting ***State v. Nathan***, 404 S.W.3d 253, 260-61 (Mo. banc 2013)). "Further, it [is] the juvenile court's function to weigh all the evidence, both which tend[s] to support relinquishment of jurisdiction and that which tend[s] to support retention of jurisdiction." ***State v. Perry***, 954 S.W.2d 554, 567 (Mo. App. S.D. 1997).